I want to reserve three minutes for rebuttal, but also I made a lame attempt of trying to file a 28-J letter, which did get filed yesterday. I started this on Monday, and if the court I inquired of your clerk, I brought extra copies as one of your clerks said would be a good idea, and I can provide that to the court if you like. It's a State case that I think is really germane to this situation. If you'd like, I can provide that. And the reason the case is germane, even though it's a State case, is that it goes directly to this issue of the stop that ended up coming into evidence in the trial. I have to say, whenever I have these suppression-type cases, what I try to do is put myself in the position of, would I be treated the same if, in fact, I was pulled over this way? And what happened was they get pulled over, and they're immediately ordered out of the car. They're immediately then sat on the curb, obviously had no ability to freely leave at that point, and immediately are interrogated and provided with questions. This, of course, leads to further ongoing interrogation and a search, ambiguous about whether there was any consent to the car search. I watched the videotape, and I didn't see any objection to the... I mean, it was an odd tape, because they seemed to be very compliant with the police, even... This is the one with the suitcase and the trunk, and they opened it with the key. I mean, I watched it, and I just didn't see any objection at all to this search. Which, of course, is the problem, is the issue that they get pulled over for tinted windshields, which could be ascertained immediately. That investigation is now over, and then we continue on going to where they're... Yes, they're absolutely compliant all the way through. In fact, what I picked up the second... Actually, third or fourth time that I watched the tape was it sure seemed like the officers precipitated the alarm going off in the car so that they could get the keys from my client, and then go into the trunk, and then go into a suitcase in the trunk with the key that was locked from there. So it was particularly egregious in that regard. And then taking that evidence, and then allowing it to come into trial when basically the evidence consists of the co-defendant, former girlfriend who feels that she was slighted, is the almost totality of what could be found to be appropriate evidence for a passenger in the backseat of the car in order to make their case. And, of course, it does make their case, and that is really... I've grappled for 30 years with 404B, and it's so interesting that, for example, with knowledge, we do not require similarity specifically. But yet, when it is so similar, it can't help but cause the problem. The reason we keep character evidence at bay is because it's so strong. It's like I often say when I'm talking about it, it's like when you're... But, I mean, counsel, I think almost certainly as an experienced practitioner, you recognize that the problem here, as the rule talks about, is the prejudicial value substantially outweigh the probative value, and we have the discretion of the trial judge making that determination. I mean, in my prior experience as a practitioner, that's a pretty high mountain to climb on an appeal. It is a high mountain, and that's why I point out so as forcefully as I can is the lack of other evidence that was before the jury. Okay? Wait a minute. Early on, there was a question, I think, about whether Juliana... Ms. Cuevas. Ms. Cuevas, thank you, was going to show up. They had trouble finding her. She hadn't appeared, and so one wondered why the prosecutor was going to this length. But, of course, she did show up at trial, and her testimony seems to me to have been quite devastating for your client. I would say that's fair. Right. Okay. So, I fully appreciate why you... If believed. I'm sorry, if believed. Right, and that's what the jury's there for. And so, if we go back to the Riverside... But, of course, the government didn't know that at the time, right? So they're trying to get the you mentioned. Right. Right. So, you went to the top of the decision tree, and I think the trial court held three hearings about whether that was going to be admissible. What's your strongest argument, sir, that the Riverside evidence was incorrectly admitted? So, my strongest part is that it is such strong character evidence, when it should have been suppressed. Okay. So, your strongest is that the probative value was substantially outweighed by? Right, but it's a combination of that it should have been suppressed. If that ruling is made correctly, then we don't have the argument about whether it comes in as 404B at all. And so, that's as forceful as I can say it, because it really tipped the balance. If I concede that the evidence, if believed, from the co-defendant, who eventually was dismissed from the case, in part because of her testimony, if, in fact, that is the case, there's just nothing else as being a backseat passenger in the car to be able to know other evidence. Well, yes, but when you say there's nothing else but, and the but is the co-defendant testifying in a way that I think is truly devastating, then it seems to me, you know, now with 2020 hindsight, we know the government had both at trial. Yes. And so, given that she was there, and she testified the way that she did, if your strongest argument is that the Riverside evidence was unfairly prejudicial, the probative value unfairly prejudicial, even given that Ms. Cuevas did testify? Yes, of course. Because she testified that he was a drug dealer, and he spent most of his time dealing drugs, right? If you believe her testimony, yes. Okay, fair enough. And, you know, that goes to some of the other issues of the domestic violence, innocently or not being, coming into evidence that makes it even worse for my client, Mr. Castillo. And so you add all those up, we end up in a trial that has a series of errors, that if done cleanly, maybe it still goes the same way. But there's a lot of errors here. You know, we have, even in the motion in limines, we have, well, not in the motion in limines, but we're not given the suppression, kind of suppression here. So it's the theft of the quarters? I understand that. But that is based on the government. It was 18? But, fair enough, except that that is all based on the government's representation. The defense, because it was not given to them in a timely way, never had a chance to investigate that, to find out if there was more to that story. I understand what Your Honor is saying. In the, if all of that is true, then it is rather de minimis. But if it's not, if there was more to the story, which I suspect there might have been, the defense was deprived of being able to go and investigate that because of the untimely disclosure. And that was, I think that the explanation there from the government, and the trial court admonished them, I think, that that should have been at least produced in camera. Right. Because it went to veracity, and veracity was going to be an issue about the Riverside stop. Right. And then the, the government... It took a risk. Ultimately, the court decided this evidence was inadmissible. But otherwise, it seems to me this would, this would have been a problem. Right. And, and the only argument was it kind of fell through the cracks between changeovers of the U.S. Attorney's... Actually, I read the record differently. I read the record to say that an AUSA, not the trial attorney, had affirmatively decided that it wasn't going to be given to the... You're right, Your Honor. I forgot that part of it, that he actually made an affirmative decision that not to turn it over and not to submit it in camera, which at a minimum should have been done. Right. And the government concedes that in this case, though. Fair enough. And, and woe be me to forget it. So the real question is the harmlessness of the error. Okay. And I understand that point. And it's to my argument, my best argument there, is the accretion of the errors that were in this trial that deprived my client of a fair trial. That he had the, the combination of allowing this evidence, which I think was, was crucial to him, allowing the, the situation where somehow it slips in the domestic violence to cause even more problems that quite upset the trial judge about it. And he had a hearing on it, eventually decided that, that we could go forward regardless of it. We need to sit back for a moment and extract those errors and say, we didn't really have a complete fair trial. And let's just retry it again, knowing the information about the officer, excluding the, the 404B material because it should be suppressed, making sure that the witness doesn't allow these slips that went on to, the way we refer to it is to slime the defendant even more. He was clearly angry at your client. Yes, clearly. There's no question about that. And so, you know, those kind of things came in. And I think that a, a new fair trial with those parameters would be, and we'll see where the chips fall in that regard, whether the, you know, she's completely believable by a jury or not. So with that, I would submit unless there's any other questions. May it please the court, Daniel Zip on behalf of the United States. Your Honor, the district court properly admitted the evidence from the Riverside stop. Rule 404B is a inclusive rule, and it's meant to exclude evidence that is, proves nothing but criminal propensity on the part of the defendant. Here, this evidence was extremely probative of the key issue and dispute in this case, and that was his knowledge. It was three months earlier, he was stopped in a car with the exact same amount of drugs, the same type of drugs, and the same type of packaging, and he admitted that it was his. That is extremely probative, and there's really nothing unfair about it that would substantially outweigh the probative value of that testimony. And both were distributable quantities of meth, yes? Yes, it was four. Packaged about the same way. Correct. Hidden in cars. Right. It was devastating evidence for the defendant, certainly. And, and the... But the government's position is that the prejudice was not unfair. Correct. There's nothing, under old chief, there has to be something that would cause the jury to return a verdict other than what the evidence proves. And here, this is direct evidence of his knowledge. There's nothing unfair about introducing this evidence. It may be very damaging to the defendant, but it's not unfair in any way. I took the defense's argument to be primarily that the court erred by not suppressing the evidence, as opposed to a straight 404B. No, I think, I think it's fair to take your friend's argument as because it was so devastating that the jury is going to improperly infer that guilty wants guilty again. I took that as your, your friend's argument, that the unfairness is that, like when somebody's charged with bank robbery and you put in for 404 purposes, a prior identical bank robbery, the jury is going to incorrectly say, did it once, did it again. Certainly, but there's, the case law in this court is very clear that evidence of past drug dealing is admissible under 404B for the element of knowledge. That there's nothing unfair about showing that someone has dealt drugs in the past to prove that they weren't unknowingly dealing them this time. So, I don't, it seems like it's not really a close question on the 404B. Well, because in this case, your argument is the only thing open here was not whether they were drugs, it's did the defendant have knowledge, which is exactly what 403 and 404 go to. That's correct, Your Honor. In this case, he's sitting in the back seat as a passenger. So, I can, I can certainly appreciate the defense's arguments on this point. But I think it's a really tough argument when you get to 403, given that Cuevas did appear and did testify. And her testimony seems to me to be, to establish most of these facts. We would agree, Your Honor. And it's not just her testimony alone. It was her testimony in combination with the border crossing records that lined up when they were crossing, with the photograph of her crossing south, the car registration that confirmed who she said the car belonged to. Because he had said that he walked across the border, and then they showed through her testimony that that was not true, that they had gone to Mexico to get drugs and came back. That's correct. So, she undermined him in that way, as did the evidence, the photographic evidence from the border. That's correct. And she identified herself and him in that picture. And the officer who first interviewed her at the port also testified that she said she was down there to party with her uncle, which then she, that confirmed her testimony that that's exactly what Mr. Castillo had told her to say. So, again, it's not just the sort of stand-alone testimony of this witness. It's fully corroborated. What about the prosecutorial misconduct count and the Brady claim? Sure. On the prosecutorial misconduct, the district court held a lengthy hearing post-trial on this issue. And what he found was that the first instance of domestic violence testimony came in response to the defense cross-examination, the mention of being punched in the face. And that couldn't be prosecutorial misconduct because we didn't elicit it. The court immediately after that... Can I ask you before you go on? Being punched in the face and having her tooth broken? That's the same testimony? That's the first one, yes. Okay, go ahead. Immediately after that, the court instructed the jury not to consider that and struck it from the record. And then took Ms. Cuevas aside outside of the presence of the jury and said, don't reference domestic violence again unless you're directly asked about it. So the second time that it came up on the sort of recall of Ms. Cuevas, all the prosecutor asked was what happened to the piece of paper with the court date on it? And it was in response to that innocuous question that she volunteered about being stabbed and going back to New Mexico. So again, this was far different from the sort of intentional knowing admission of inadmissible evidence on the part of the prosecutors. And that first question was then raised no objection. There was a few follow-up questions about sort of the logistics of why she didn't come to the court because she didn't have transportation, because she didn't have an ID. And then there was one more follow-up question sort of as... Well, on the objection part, the defendant was between a rock and a hard place there. Because you look at the testimony on the second one and the jury might not infer that it was the defendant. But if the defense makes a big deal about it by objecting and getting a limiting instruction from the judge, it highlights for the jury that it probably was the defendant. So that's a very difficult position for a defense counsel to be in given the nature of that testimony. Certainly, and it was ambiguous. Her response word for word was, after I had gotten stabbed and everything, I had went back to New Mexico. It's not clear from that. It almost suggests that she was stabbed in New Mexico. And it certainly doesn't tie back directly to Mr. Castillo. Although, honestly, counsel, in the real world, I think most juries, if they remember and pay attention to that, they're going to infer that it was the defendant, given what had happened up to that point. That's fair enough. But when that testimony came out, the court immediately stopped proceedings, asked the jury to disregard it and not to consider it. And under this court's case law, we assume that the jury followed the court's instructions. So even if it was a mistake on the part of the prosecutor to ask these questions, knowing that there was a possibility of this coming out, the district court found that it would not have affected the outcome of trial such that it would support granting a new trial based on prosecutorial misconduct. And that's not only because of the curative instruction, but it's also, as I mentioned, that it was a sort of ambiguous statement that the counsel was given the opportunity for a curative instruction and declined it in light of the ambiguity. And, of course, the evidence in this case was overwhelming. In a case, as the district court recognized, this is far different from the average border bust. This was a case with a co-defendant who testified precisely what happened in the months leading up to this. The defendant was drug dealing constantly, that they had gone to Mexico once before. You had, of course, the 404B evidence, which was extremely damaging. You had his jail calls after the arrest and when she's instructing someone to delete all his Facebook posts. So this is really, you know, we often say the evidence is overwhelming in border bust cases, but this really was overwhelming evidence. And the idea that these two ambiguous statements that were stricken from the record would have somehow affected the outcome of the trial, the district court probably found that this did not warrant a new trial. And the Brady violation? Certainly. We acknowledge that that should have been turned over at the first instance. It's not clear why that first prosecutor didn't make that decision, but I think what happened at the preparation for trial, the new prosecutor asked the sort of candid questions that were required to ask of all our law enforcement witnesses, one of which is, do you have any past convictions? As soon as she learned of that, she turned it over to the defense. But at the end of the day, the court ruled that under Rule 609, it was inadmissible, that it was over 10 years old. It was when the witness was 18 years old and it was a minor theft involving eight quarters. So the fact that it was inadmissible sort of by definition means that it would not have changed the outcome had it been provided earlier. And the defense did receive it in advance of trial, which this court has held is sufficient to meet the Brady requirements. I found this really disappointing. We published on this pretty recently. In the Bruce case, we talked about where members of the U.S. Attorney's Office came forward and really insisted that because something wasn't material, in their view, they didn't have to produce it, which, of course, is upside down and backwards. And in that litigation, what was represented to us is that the manual has been changed and there's been teaching on this very point. And so I just wanted to express that I found it disappointing and concerning. I understood, Your Honor, but I would say we don't – that prosecutor had left the office at the time. We don't know exactly what happened the first time, but what we do know is that the trial prosecutor, as soon as she learned of this, immediately turned it over to the defense, not even to the court in camera, but just turned it over as material. So certainly the first prosecutor should have done the same thing, but I don't know the details of what went into that decision. I've got lots of time left. I'm happy to answer any other questions that the court might have. Thank you. Thank you, Counsel. I'm not sure I've ever said this before, but this panel really seems to grasp all the issues in the case, and I didn't hear anything new from government counsel. I would just leave you with the fact that there's this series of errors that lead to a trial that just doesn't rise to the standard of fairness and that the errors are easily curable, and we'd have the time to be able to investigate if the Brady violation is not any more than what was represented by the court, and that I would just ask that the court return this to be retried with those admonitions. Thank you. Thank you very much, Counsel. United States v. Castillo is submitted.
judges: WARDLAW, CHRISTEN, BENNETT